**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| LISA DAUBERT | |
| Appellant | No. 1690 MDA 2021 |

Appeal from the Judgment of Sentence Entered November 17, 2021
In the Court of Common Pleas of Luzerne County
Criminal Division at No: CP-40-CR-0000047-2020

BEFORE:  STABILE, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J:                    **FILED OCTOBER 17, 2022**

Appellant, Lisa Daubert, appeals from the November 17, 2021 judgment of sentence imposing six months of probation for driving under the influence of a controlled substance ("DUI") under 75 Pa.C.S.A. § 3802(d)(2) and careless driving (75 Pa.C.S.A. § 3714(a)).  We affirm.

The circumstances of Appellant's arrest were as follows:

Officer [Christopher] Benson[1] was dispatched to a motor vehicle accident on Market Street and Wilkes-Barre Boulevard.  Officer Benson arrived at the accident, and questioned [Appellant], who acknowledged she was driving the vehicle from a methadone clinic, when she caused an accident while attempting to switch lanes.  During the interaction, Officer Benson noticed that [Appellant] had slow, sluggish reactions, watery eyes, and

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The trial court's opinion refers to Officer Christopher "Benton."  The parties and the certified transcript spell his surname "Benson."  We will use the surname "Benson" in accord with the certified record.

abnormally pinpointed pupils, which suggested [Appellant] was under the influence of narcotics. Officer Benson observed a passenger in the vehicle, who also appeared to be under the influence of a narcotic. Officer Benson obtained [Appellant's] consent to search the vehicle; and found a spoon and a small piece of cotton, which is "commonly used for the injection of heroin."

Officer Benson did not conduct field sobriety tests, due to high traffic in the area, and because [Appellant] did not show any evidence of alcohol intoxication. Based upon Officer Benson's observations, he asked [Appellant] to consent to a blood test, to which [Appellant] agreed. Officer Benson placed [Appellant] in custody, and transported her to Geisinger Wyoming Valley Hospital for the blood draw. At the hospital, Officer Benson read [Appellant] the DL-26 form, which she signed and acknowledged. The results of the blood draw confirmed Officer Benson's observations of [Appellant] at the scene of the accident.

Trial Court Opinion, 2/14/22, at 1-2 (pagination ours).

Appellant's blood test revealed greater than 500 nanograms per milliliter of methadone. N.T. Trial, 7/7/21, at 25. The laboratory reported the amount as "greater than" 500 nanograms because 500 nanograms was the top of the measurable scale on the test that was used. *Id.* According to the Commonwealth's expert, Dr. Michael Coyer, the average concentration in "methadone maintenance subjects" was 110 nanograms per milliliter with a range of 30 to 560 nanograms per milliliter. *Id.* at 34. The test performed on Appellant confirmed only that her levels were greater than 500 nanograms per milliliter, but there was no way to know how much greater. *Id.* at 35. The record indicates that Appellant received her clinical dose between 6:30 and 7:30 a.m. on the day of the accident and the accident occurred at 10:00 a.m. *Id.* at 33, 38. Dr. Coyer testified that methadone takes several hours

to absorb into a person's system and reach peak level. *Id.* at 33. Appellant also had 39 nanograms per milliliter of clonazepam in her system—an amount within in the therapeutic range. *Id.* at 25, 56. Both drugs, however, are central nervous system depressants that can cause drowsiness and slow movement. *Id.* at 26. The symptoms Officer Benson observed in Appellant at the scene of the accident were consistent with impairment from a central nervous system depressant. *Id.* at 26-28. The amounts of methadone and clonazepam in Appellant's system were sufficient to impair her ability to drive, according to Dr. Coyer. *Id.* at 28. Dr. Coyer also testified that Appellant would not have built up a tolerance to that level of methadone during the time she had been on it. *Id.* at 85-86.

Appellant testified that she had a problem with heroin since she was 15 years old. *Id.* at 37. On the day of the accident, she received her therapeutic dose of methadone at a clinic after she passed a urine test. *Id.* at 39. She was told at the clinic that she was clear to drive. *Id.* at 46. She took the clonazepam at 6:30 p.m. the evening before the accident. *Id.* It was prescribed to her to help control seizures and anxiety. *Id.* at 39, 46, 56. Appellant said she maneuvered her car from the right turn lane to the middle lane as she was approaching an intersection. *Id.* at 42. She believed the car in the middle lane in front of her was going to proceed through the intersection while the traffic light was yellow. *Id.* at 43. When the vehicle stopped, she rear-ended it. *Id.* Appellant testified that the front end of her car was totaled.

*Id.* at 44. Appellant said her speech was abnormal at the time of the accident because she was getting used to a new set of dentures after an abusive former romantic partner smashed her old ones. *Id.* at 44. She said her eyes were glassy and watery because she was crying after the accident. *Id.* at 44-45.

Appellant's expert, Dr. Lawrence Guzzardi, testified generally that many patients of methadone clinics are able to drive safely after their therapeutic dose. *Id.* at 62-64, 76. He testified that Appellant's light green eyes, which are more sensitive to light, could have accounted for her dilated pupils. *Id.* at 60. He also testified that Appellant's dentures are loose, and would have been even looser at the time of the accident, thus accounting for the quality of Appellant's speech. *Id.* at 73. We will not review Dr. Guzzardi's testimony in detail, as the trial court found Dr. Coyer's testimony more credible on the matters in which the two experts disagreed. Trial Court Opinion, 2/14/22, at 9.

At the conclusion of a July 7, 2017 bench trial, the court found Appellant guilty of the aforementioned offenses. The trial court imposed sentence on November 17, 2021, and Appellant did not file post-sentence motions. She filed a timely notice of appeal on December 16, 2021. The sole issue before us is whether the evidence was not sufficient to support Appellant's conviction under § 3802(d)(2) because there is no evidence she was incapable of safely driving a car.

Our standard of review for a sufficiency of the evidence claim is *de novo*, and "our scope of review is limited to considering the evidence of record, and all reasonable inferences arising therefrom, viewed in the light most favorable to the Commonwealth as verdict winner." ***Commonwealth v. Rushing***, 99 A.3d 416, 420-21 (Pa. 2014). Section 3802(d)(2) provides:

> **(d) Controlled substances.--**An individual may not drive, operate or be in actual physical control of the movement of a vehicle under any of the following circumstances:
>
> […]
>
> (2) The individual is under the influence of a drug or combination of drugs to a degree which impairs the individual's ability to safely drive, operate or be in actual physical control of the movement of the vehicle.

75 Pa.C.S.A. § 3802(d)(2). "This section does not require proof of a specific amount of a drug in the driver's system. It requires only proof that the driver was under the influence of a drug or combination of drugs to a degree that the ability to drive is impaired." ***Commonwealth v. Tarrach***, 42 A.3d 342, 346 (Pa. Super. 2012). Section 3802(d)(2) does not mandate expert testimony in all cases; the utility of and need for expert testimony is to be evaluated on a case-by-case basis. ***Commonwealth v. Griffith***, 32 A.3d. 1231, 1238 (Pa. 2011).

Appellant argues that ***Commonwealth v. Segida***, 985 A.2d 871 (Pa. 2009), illustrates the body of evidence necessary to sustain a conviction for impaired driving. In ***Segida***, the defendant was convicted of general impairment after the consumption of alcohol under 75 Pa.C.S.A.

§ 3802(a)(1).[2] The defendant was apprehended after a one-vehicle accident; he lost control of his car and drove it off the road into some brush. *Id.* at 873. He failed several field sobriety tests and a blood test revealed his blood alcohol content to be 0.326 percent. *Id.* The defendant smelled strongly of alcohol and admitted he had been drinking at a club before driving home and having the accident. *Id.* This Court vacated the conviction, concluding that the Commonwealth failed to produce evidence that the defendant was impaired by alcohol during the time he was driving because "the Commonwealth had failed to establish any temporal connection between the time of the accident and the time that the officer arrived at the scene[.]"[3] *Id.* at 874. The Supreme Court reversed, holding that the defendant's admission that he lost control of his vehicle while on the way home from a club where he had been drinking, combined with the strong odor of alcohol on his breath,

_____

[2] Section 3802(a)(1) provides, "An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle." 75 Pa.C.S.A. § 3802(a)(1).

[3] The primary issue in **Segida** was whether § 3802(a)(1) was an "at the time of driving" offense, meaning that the Commonwealth must prove the defendant was impaired while he was driving. The Supreme Court concluded it was. **Segida**, 985 A.2d at 878-79. Instantly, unlike **Segida**, Officer Benson observed Appellant—and her visible signs of impairment—only minutes after the accident occurred. We have no occasion to opine on whether § 3802(d)(2) is an "at the time of driving offense" because, given the record before us and the applicable standard of review, the resolution of that issue will not affect the outcome of this appeal.

his failure of field sobriety tests, and his ("strikingly high") BAC were sufficient to conclude that he had been impaired while he was driving, not merely afterward. *Id.* at 880.

The *Segida* Court noted that "the offender's actions and behavior, including manner of driving and ability to pass field sobriety tests; demeanor, including toward the investigating officer; physical appearance, particularly bloodshot eyes and other physical signs of intoxication; odor of alcohol, and slurred speech[,]" in addition to blood alcohol level, are relevant to determining impairment. *Id.* at 879. "The weight to be assigned these various types of evidence presents a question for the fact-finder, who may rely on his or her experience, common sense, and/or expert testimony." *Id.*

Appellant also relies on *Tarrach*, a § 3802(d) case in which the defendant caused an automobile accident after taking a mix of prescription drugs, including benzodiazepine, amphetamine, and oxycodone. *Tarrach*, 42 A.3d at 344. The arresting officer testified that the defendant failed field sobriety tests and exhibited signs of drug intoxication during those tests. *Id.* The Commonwealth's expert testified that the amounts of these substances in the defendant's blood stream were in the therapeutic range, but because of the adverse effects of the drugs the defendant was incapable of safely driving. *Id.* at 344, 346-47. The defendant acknowledged driving and taking prescription medications and that her medicine sometimes made her groggy, but she blamed her unsteady gait on osteoarthritis and her apparent confusion

on attention deficit disorder. *Id.* at 346. Thus, she claimed the results of the field sobriety tests were not indicative of impairment. *Id.* The Commonwealth introduced evidence, in addition to that mentioned above, that the defendant was driving erratically before the accident, that she was holding her car to stay balanced while attempting to walk, that she had glassy eyes and slurred speech, and that she appeared "dazed and confused" to the police officer at the scene. *Id.* at 346. This Court held that the evidence was sufficient in support of the defendant's conviction under § 3802(d)(2). *Id.* at 347.

Appellant argues that the evidence in support of convictions in *Segida* and *Tarrach* were much stronger than it is here, particularly in light of the failed field sobriety tests in both cases. Appellant also notes that her blood test, which revealed that she had at least 500 nanograms per milliliter of methadone in her blood (the top of the scale for the test employed), could not confirm that she had more than a therapeutic level, which Dr. Coyer capped at 560 nanograms per milliliter (though Dr. Coyer said the average therapeutic dose is 110 nanograms per milliliter).

In our view, Appellant reads *Segida* and *Tarrach* too narrowly. Officer Benson testified, based on his experience, that Appellant was exhibiting signs of impairment stemming from drug use. Her speech, delayed answers to his questions, and abnormally dilated pupils all indicated to Officer Benson that Appellant was impaired. Further, Officer Benson arrived at the scene of the accident only minutes after it occurred. In addition, the Commonwealth

offered the expert testimony of Dr. Coyer, who confirmed that Officer Benson's observations were consistent with impairment from drug use. Dr. Coyer also testified that the amounts of methadone and clonazepam in Appellant's system were sufficient to cause impairment, and he testified that Appellant would not have developed a tolerance to such a high level of methadone in the time she had been taking it. While Dr. Guzzardi contradicted much of Dr. Coyer's testimony, the trial court found him less credible.

Considering the record in light of the applicable law, particularly *Segida* and *Tarrach*, we find Appellant's argument lacking in merit. The *Segida* Court listed field sobriety tests as an item that is helpful in analyzing the sufficiency of the evidence in support of convictions under § 3802(a). While we find that list helpful and instructive in analyzing convictions under § 3802(d), nothing in *Segida*, or any other case law, expressly or impliedly mandates field sobriety tests. The instant record contains evidence of the condition of Appellant's eyes and speech, as well has her delayed answers to Officer Benson's questions. These are items the *Segida* Court listed as helpful and to be weighed by the trier of fact. Further, the Commonwealth produced expert testimony confirming that the level of methadone and clonazepam in Appellant's blood would have impaired her ability to drive. Finally, we note the circumstances of the accident—Appellant rear ended the car in front of her as it slowed down in response to a yellow light. The impact was sufficient, by Appellant's own testimony, to total the front end of her car.

Furthermore, *Tarrach* teaches that a person can be impaired within the meaning of § 3802(d)(2) even if blood tests reveal the presence of therapeutic levels of the substances in question. Clearly the Commonwealth was not required to prove, as an element of this offense, that the concentration of methadone in Appellant's blood was higher than 560 nanograms per milliliter—the high end of the therapeutic range according to Dr. Coyer. Also, *Tarrach* teaches that the finder of fact is not required to accept the defendant's alternate explanations for the apparent signs of intoxication. In *Tarrach*, the defendant claimed to have difficulty walking due to arthritis, and confusion in responding to an officer's questions because of attention deficit disorder. Here, Appellant attributed her difficulty in speaking to her dentures and the condition of her eyes to her crying about the accident and/or to her light green eyes. In both cases, these matters were to be resolved by the finder of fact. On appeal, we accept the trial court's credibility determinations and draw all reasonable inferences in favor of the Commonwealth as verdict winner. Applying that standard, we conclude that Appellant's sufficiency of the evidence argument fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>10/17/2022</u>